■ SEALINK FUNDING LIMITED, Appellant, v MORGAN STANLEY et al., Respondents. SEALINK FUNDING LIMITED, Appellant, v UBS AG, UBS AMERICAS INC., et al., Respondents. [19 NYS3d 282]—

Order, Supreme Court, New York County (Eileen Bransten, J.), entered April 18, 2014, and order, same court (Charles E. Ramos, J.), entered July 14, 2014, which granted defendants' respective motions to dismiss the complaints, unanimously affirmed, with costs.

These fraud actions, commenced by the assignee of certain residential mortgage-backed securities (RMBS) certificates, were correctly dismissed for lack of standing. The initial purchasers of the RMBS certificates (Phase 1) were certain Irish special purpose vehicles (Irish SPVs); they purchased approximately $507 million worth of RMBS that the Morgan Stanley defendants (Morgan Stanley) underwrote between 2005 and 2007, and about $158 million in RMBS certificates that the UBS defendants (UBS) underwrote in 2006 and 2007. The Irish SPVs then assigned the certificates to certain Cayman Islands SPVs (Phase 2), before the Cayman SPVs assigned them to plaintiff in June 2008 (Phase 3).

The sale and purchase agreements (SPAs), dated June 7, 2008, applicable to the assignment of the Cayman SPVs to plaintiff provide that "[t]he Seller with full title guarantee and as beneficial owner hereby agrees to sell, and the Purchaser hereby agrees to purchase, each Asset at a price equal to the relevant Asset Purchase Price, on the terms and subject to the conditions of this Agreement." "Asset" is defined as "each of the assets listed in Schedule 1"; Schedule 1 to each of the SPAs lists the RMBS certificates at issue. The Master Definitions Schedule, in the Master Framework executed the same day as the SPAs, provides that "[a]sset has the meaning given to it in Clause 1 (*Definitions*) of each [SPA]." Under "Principles of Interpretation and Construction," the master framework provides that " 'assets' includes present and future properties, revenues and rights of every description." The issue is whether, under English law, the foregoing provisions effectively transferred tort claims to plaintiff.

There is no express assignment of tort claims in the SPAs. Contrary to plaintiff's contention, the above-cited language,

"present and future properties, revenues and rights of every description," reveals no identifiable intention to include tort claims (*see Tailby v Official Receiver* [1888] 13 App Cas 523 [HL] 525). Moreover, UBS's legal expert, Bankim Thanki, Q.C., opined that "[s]ave perhaps in the most exceptional circumstances, an English court is very unlikely to find [that] an equitable assignment of a cause of action associated with an asset has taken place where there is a contract governing the transfer of that asset, and yet no words of that contract refer to 'claims,' 'legal rights of action' or 'sums of money recoverable' or some similar language." Indeed, it is not credible that these sophisticated parties, represented by counsel, intended to transfer legal claims without expressly mentioning that intent in any of the hundreds of pages of their agreements (*see Allied Carpets Group Plc v MacFarlane* [2002] EWHC 1155 [TCC] [35]; *cf. Commonwealth of Pennsylvania Pub. Sch. Employees' Retirement Sys. v Morgan Stanley & Co., Inc.*, 25 NY3d 543 [2015]). That the right to bring tort claims had been expressly conveyed in the 2004 Master Framework related to Phase 2 (the Irish SPVs' transfer of the certificates to the Cayman SPVs) supports our conclusion that the omission of such claims from the Phase 3 SPAs was intentional.

Nor is the Master Framework's broad language ambiguous as to the assignment of the tort claims. First of all, plaintiff's argument on this point is not preserved because it is raised for the first time on appeal. In any event, the provision of the Master Framework at issue, the other relevant provisions of the Master Framework, and the SPAs, read together, clearly indicate that the only assets being transferred are the certificates themselves (*see Procter & Gamble Co. v Svenska Cellulosa Aktiebolaget SCA* [2012] EWCA [Civ] 1413 [22] ["the Agreement, considered as a whole, is not reasonably capable of being given two possible meanings"]).

Despite plaintiff's argument that we should view the case in light of the "commercial context" of the transaction and "business common sense," we do not find an implied assignment of legal claims. Taking into account business common sense does not "mean that one can rewrite the language which the parties have used in order to make the contract conform to business common sense" (*Rainy Sky S.A. v Kookmin Bank* [2011] UKSC 50 [23]). Further, in the above-cited *Procter & Gamble* ([2012] EWCA [Civ] 1413 [22]), a unanimous panel of the English Court of Appeal squarely rejected the "commercial context" argument of plaintiff's expert. It is reasonable to conclude that, because the parties' unambiguous Phase 3 agreements do not expressly

transfer legal claims to plaintiff, the parties did not intend to transfer legal claims to plaintiff (*see Attorney Gen. of Belize v Belize Telecom Ltd.* [2009] UKPC 10).

We reject plaintiff's argument that an assignment can be implied on the ground that the possibility of suing defendants was foreseeable. Plaintiff cites an unrelated case indicating that investors were not yet on notice, for statute of limitations purposes, of RMBS fraud claims against Morgan Stanley in July 2008, one month after the Phase 3 assignment from the Cayman SPVs to plaintiff in this action (*Allstate Ins. Co. v Morgan Stanley*, 2013 NY Slip Op 31130[U] [Sup Ct, NY County 2013], *affd* 117 AD3d 546 [1st Dept 2014]). However, notice of a claim for New York statute of limitations purposes is not the same as an awareness that one might seek to pursue claims at some future time, which is all that foreseeability under English law requires. Plaintiff itself alleges that the Phase 3 transfers were part of a "bad bank" strategy intended to isolate the "toxic" RMBS at issue and that it is a "special purpose vehicle that was established to receive, hold, and manage toxic RMBS assets, including the Certificates." Thus, plaintiff cannot credibly argue that it did not foresee that it might want to pursue claims in connection with the "toxic" certificates it purchased.

For the reasons underlying our rejection of the implied assignment arguments, we will not infer an assignment of legal claims based on the parties' conduct. *Coulter v Chief Constable of Dorset Police* ([2003] EWHC [Ch] 3391), and *Ifejika v Ifejika* ([2010] EWCA [Civ] 563), upon which plaintiff places much reliance, are factually distinguishable. *Coulter* concerned the equitable assignment of a judgment debt from a former chief constable of the Dorset police to the then-current chief constable. In that case, the court held that the debt was assigned to the chief constable's successor even without a written contractual assignment because the former chief held the payment of the debt in trust for his successor. Thus, *Coulter* is sui generis and not relevant to the situation presented here. In *Ifejika*, which involved a design infringement dispute between brothers over a contact lens cleaning device, the court found only the possibility of an equitable assignment absent a written agreement; however, although the court allowed the matter to go to trial, it did not determine if there had actually been an equitable assignment. By contrast, this case presents written agreements drafted by counsel in a highly complex transaction between sophisticated parties. Likewise, there exists a previous 2004 Master Framework that did expressly transfer legal claims.

We also find that legal claims were not transferred in Phase 2. Those transfers were effectuated pursuant to trade tickets or sales confirmations or both, which make no reference to the assignment of tort claims. We have already rejected plaintiff's "commercial context" and "business common sense" arguments.

We have considered plaintiff's remaining arguments and find them unavailing. Concur—Friedman, J.P., Acosta, Renwick, Andrias and Moskowitz, JJ. **[Prior Case History: 2014 NY Slip Op 31031(U).]**